IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CR3117 |
| | ) | |
| v. | ) | |
| | ) | |
| TRAVES RUSH and MARCUS | ) | FINDINGS AND |
| SHORT, | ) | RECOMMENDATION |
| | ) | |
| Defendants. | ) | |

Defendants Traves Rush ("Rush") and Marcus Short ("Short") have filed motions to suppress evidence, including cash and plastic bank bags found in a vehicle they occupied on October 6, 2008.  Filing nos. 37 and 43. For the reasons set forth below, the respective motions should be denied.

## STATEMENT OF FACTS

On October 6, 2008, Lancaster County Sheriff's Deputy Kirk Price was monitoring radio traffic from his position in Northwest Lincoln, Nebraska.  At approximately 12:15 p.m.,  Deputy Price heard a report regarding a robbery of a branch of the TierOne Bank (the "Bank") near 56th Street and Highway 2 in Lincoln.  The report indicated that three black males, at least one of which was wearing black pants, fled the Bank in a blue Chrysler Lebaron.  Later reports indicated the suspects abandoned the blue Lebaron and might be traveling in a red vehicle.

Upon hearing the initial reports of the robbery, Deputy Price proceeded to a gas station at the intersection of 84th Street and Cornhusker Highway, a route commonly used

to access Interstate 80; thus, a possible escape route.[1]   Shortly after arriving at the gas station, Deputy Price observed three black males in a dark gray Chevrolet Caprice Classic traveling east toward Interstate 80 on Cornhusker Highway.  Deputy Price followed the vehicle, but did not activate his lights or attempt to stop the vehicle.  After Deputy Price followed the vehicle for approximately one and a half miles, the vehicle turned south into the parking lot of Novartis Pharmaceuticals Corporation ("Novartis").  Deputy Price followed the vehicle into the Novartis parking lot.  The defendants' vehicle made a loop in the parking lot and then stopped by the entrance to the main building at which point a black male, later identified as Curtis Cotton ("Cotton"), exited the vehicle.  The defendants' gray vehicle subsequently drove down a parking row perpendicular to the Novartis building and pulled into a parking stall.

Deputy Price pulled into the parking row where the gray vehicle had parked, but stopped his vehicle prior to reaching the gray car, and in such a manner as to not prevent the car from leaving.  Deputy Price observed a second black male, later identified as defendant Rush, exiting the parked vehicle and walking towards the entrance of the Novartis building.  Deputy Price exited his vehicle and asked Rush "Where they were going?" "Where they were coming from?" and "What they were doing there?"  Rush answered that he and his companions were traveling to Omaha and that Cotton was going to visit his mother who worked at Novartis.

At approximately the same time as Deputy Price was questioning Rush, Cotton exited the building and began walking toward Deputy Price, Rush, and the gray vehicle.  As Cotton exited the building, Deputy Price observed "a rolled up wad of currency or bills that was

---

[1]  Deputy Price and Officer Johnson testified that it is law enforcement procedure for officers to watch areas with easy access to the interstate after a bank robbery has been reported.

2

stuck in the top"of one of Cotton's shoes.  Deputy Price immediately grabbed the wad of rolled up currency, placed it in his back pocket, and handcuffed Cotton.

A second law enforcement officer, Lincoln Police Officer Mark Johnson, arrived at Novartis and parked his squad car behind Deputy Price's car during Deputy Price's initial encounter with Rush.  When Officer Johnson observed Deputy Price detain Cotton, he immediately detained Rush and placed him in the back of his squad car.  Rush did not resist and Deputy Johnson did not handcuff Rush.

Upon observing Cotton and Rush being taken into custody, the final individual in the car, later identified as Short, backed the gray vehicle out of the parking stall, and began to flee the scene.  Deputy Price stayed with Cotton while Officer Johnson entered his squad car, activated his patrol lights, and began to chase the vehicle driven by Short.  After a brief chase in the parking lot, Short drove the gray vehicle back up the parking row that Deputy Price's car already occupied.  Officer Johnson navigated his squad car behind Short's vehicle in the parking row, effectively trapping Short between the two squad cars.  Short stopped the gray car prior to reaching Deputy Price's squad car, exited the vehicle while it was still running, and fled on foot.  Officer Johnson exited his squad car and chased Short. Short was eventually apprehended and taken into custody.

Lincoln police officer Larry Bratt, who was also monitoring radio traffic, arrived at Novartis sometime after Short fled the parking lot.  After the suspects were detained, Officer Bratt was assigned to "process" the gray vehicle in which Cotton, Rush, and Short were riding.  From the outside driver's side window of the vehicle, Officer Bratt observed "a lot of folded up cash" and a "blue plastic bank bag"on the floorboard of the passenger's side front seat (Exs. 5, 6 & 104), a  TierOne bank bag on the front seat (Exs. 105 & 108), and black coveralls (Ex. 105).  The driver's side window was rolled down, and without placing

his head inside the defendants' vehicle, Officer Bratt photographed the items seen in the front seat area of the vehicle.  Officer Bratt then circled to the rear passenger side window, and from that location, could see an opaque plastic bag containing cash on the floorboard of the passenger's side back seat (Ex. 7).  Officer Bratt later opened the vehicle doors to obtain better photographs of the items in the vehicle, but he testified that he did not need to open the vehicle doors to see to the items of evidence.  The items seen in the vehicle were removed before transport to the impound lot because the front driver's side window was down and it was starting to rain.

## LEGAL ANALYSIS

Defendants argue that the stop and subsequent search of the vehicle violated their Fourth Amendment rights because the initial encounter with Deputy Price was an impermissible investigatory stop and the subsequent warrantless search of the vehicle was without probable cause; therefore, they argue, all evidence obtained from the search of the car should be suppressed.

## I.    The initial encounter.

Defendants argue that the initial contact between the law enforcement officers and the defendants amounted to an impermissible traffic stop because Deputy Price had no reasonable suspicion to detain the defendants under the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968) and its progeny.

However, the principles of Terry are only implicated when the contact between the law enforcement officers and a citizen arises to the level of a seizure.  Not all interactions between law enforcement officials and citizens involve a seizure of the person.  See Terry

4

v. Ohio, 392 U.S. at 19 n. 16 (1968); see also Florida v. Bostick, 501 U.S. 429, 434 (1991)(finding that mere police questioning does not constitute a seizure). Indeed, "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " United States v. Mendenhall, 446 U.S. 544, 553-54 (1980)(quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)). Law enforcement officers do not violate the Fourth Amendment by simply approaching a citizen in a public place and asking him or her questions.  See Bostick, 501 U.S. at 434.

In evaluating whether an encounter between a law enforcement officer and a citizen rises to the level of a Fourth Amendment seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " Bostick, 501 U.S. at 437, (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).  When conducting this analysis, examples of circumstances a court will consider include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554.

Applying these principles to the facts of this case, the initial encounter between Deputy Price and the defendants did not amount to a seizure under the Fourth Amendment. Deputy Price followed the vehicle in which the defendants were passengers into the public parking lot at Novartis.  There is no evidence that Deputy Price activated the patrol vehicle lights or positioned his squad car in a manner that would have prevented the vehicle occupied by the defendants from leaving. The evidence further demonstrates that when Deputy Price approached Rush, he did so without drawing his weapon and simply posed

5

questions to Rush in a normal tone of voice. In short, nothing in Deputy Price's conduct would lead a reasonable person to believe that he could not go about his business or ignore the police presence.  See Barry, 394 F.3d 1070, 1074-1077 (8th Cir. 2005) (finding no seizure where a police officer knocked on the window of a parked car and attempted to question the occupants); United States v. Dockter, 58 F.3d 1284, 1286 (8th Cir. 1995) (finding no seizure where a law enforcement officer activated his warning lights and pulled in directly behind a vehicle parked on the side of a road and questioned the occupants); United States v. Angell, 11 F.3d 806, 809-10 (8th Cir. 1993) (abrogated on other grounds)(finding no seizure where a law enforcement officer approached a car on a public road and told the occupant to "stay there," without activating his patrol lights, blocking the pathway of the citizen's car, or drawing his weapon).

## II.    The seizure of evidence.

Defendants further argue that the evidence should be suppressed because it was procured  through a warrantless search.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  However, when objects are in plain view of an officer, no Fourth Amendment search has occurred.  "It is settled that an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in position from which he or she views the object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object."  United States v. Bynum, 508 F.3d 1134, 1137 (8th Cir. 2007) (quoting United States v. Bustos-Torres, 396 F.3d 935, 944 (8th Cir. 2005)). An individual who parks a car with transparent windows on private property "does not have a reasonable expectation of privacy in the visible interior of the car."  See United States v. Hatten, 68 F.3d 257, 260 (8th

6

Cir. 1995)(citing Texas v. Brown, 460 U.S. 730, 740 (1983)). Because the requirements of the plain view exception are met in this case, the law enforcement officers validly seized the cash and other items of evidence from the vehicle.

Defendants argue that the law enforcement officials improperly attempted to prevent Short from leaving in the vehicle, thus leading to an impermissible search of the vehicle. It is true that if an officer first stops a car, the initial stop must be legal for the plain view exception to apply.  See United States v. Wilson, 524 F.2d 595 (8th Cir. 1975)(noting that the "initial intrusion" of the law enforcement officer must be lawful for a search under the plain view doctrine to be valid).  In this case, the law enforcement officials had the requisite reasonable suspicion to stop the vehicle that Short was driving.

A law enforcement officer may conduct a brief investigatory stop if the officer has a reasonable, articulable suspicion that the individual is involved in criminal activity.  See Terry v. Ohio, 392 U.S. 1, 30 (1968). To satisfy the Fourth Amendment, the officer must be able to articulate some minimal, objective justification for a Terry stop.  See United States v. Walker, 494 F.3d 688, 691 (8th Cir. 2007).

In this case, given the totality of the circumstances, the officers were justified in detaining Rush and stopping the vehicle that Short was driving.  Rush, Short, and Cotton met the general description of the suspects who robbed the Bank.  They were spotted shortly after the robbery was reported at a location which was a potential escape route leading out of the city.[2]  See United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006)(finding

---

[2] The defendants make much of the fact that the law enforcement reports indicated that the suspects might be traveling in a red vehicle.  However, the suspects were already believed to have changed cars once. Thus, it was reasonable for the law enforcement officers to investigate non-red vehicles.

reasonable suspicion where an individual met the general description of a bank robbery suspect and was seen in an area near the bank).  Deputy Price spotted a roll of U.S. currency laying loosely atop Cotton's untied high-top shoes.  Additionally, in Short's case he attempted to flee once he saw Cotton and Rush being detained.  Short's flight, when considered with all of the factors present in this case, provided further reasonable suspicion on the part of the law enforcement officers to stop the vehicle. See United States v. Jackson, 175 F.3d 600 (8th Cir. 1999)(finding that the flight of an individual along with other factors provided reasonable suspicion for a Terry stop).

Based on all of the facts known to the law enforcement officers at the time, they had reasonable suspicion to detain Rush and Short and to prevent Short from leaving the premises in the gray vehicle.  See, e.g., United States v. Scott, 270 F.3d 30 (1st Cir. 2001)(noting that an investigatory stop of an individual who was known to be driving a car of a suspected check forger); United States v. Price, 184 F.3d 637 (7th Cir. 1999)(finding police had sufficient individualized suspicion to detain four individuals who occupied a car that police had been anonymously informed contained cocaine).

The "incriminating nature" prong of the plain view exception is also met.  The incriminating nature of the objects discovered in the vehicle was readily apparent to the law enforcement officers.  The plain view doctrine "does not authorize police to seize an innocent object in plain view to see whether it might be a guilty object after all." United States v. Cervantes, 19 F.3d 1151, 1153 (7th Cir. 1994)(citing Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149 (1987)).  However, when considered in the totality of the circumstances, the incriminating nature of the objects may be obvious to law enforcement officers.  See United States v. Martinez, 462 F.3d at 908(finding a wad of cash on a suspected bank robber to be incriminating); see also Carpenter v. Sigler, 419 F.2d 169, 172 (8th Cir. 1969)(finding

8

tools in the front seat of a car properly seized under the plain view doctrine because a series of burglaries had recently taken place near the location where the car was stopped).

In this case, there is no question that the incriminating nature of the cash, blue plastic bank bag, TierOne bag, black coveralls, and other items in plain view was obvious to the law enforcement officials when considered in the context of all the circumstances presented. Rush, Short, and Cotton met the general description of the bank robbery suspects; they were observed driving on a road and heading in a direction that law enforcement officers have identified as a possible escape route; a roll of cash had already been discovered on Rush and Short's companion, Cotton; and Short had attempted to flee the scene first by car and then on foot.  See United States v. Martinez, 462 F.3d at 908 (finding a wad of cash on a suspect meeting the general description of a bank robbery suspect who was walking fast in a location near the bank to be incriminating); see also United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996)(abrogated on other grounds)(finding the seizure of "bundles of cash" in plain view in a suspects vehicle to be valid), United States v. Cervantes, 19 F.3d 1151, 1153 (noting that a wad of cash can be evidence of criminal activity when combined with other facts).  Thus, the "incriminating nature" prong of the plain view doctrine was met.

Short also elected to abandon the car where no expectation of privacy existed and where the law enforcement officers were rightfully located.  See Hattan, 460 U.S. at 261. In Hattan, a police officer inspected the interior of a vehicle parked in the lot of a private nightclub.  The Hattan court determined that the officer's conduct was not a search because it involved "merely looking at what was already exposed to view" at a public place. Id. (quoting Arizona v. Hicks, 480 U.S. 321, 328 (1987).

In this case, Short and Rush could have no expectation of privacy in the items that could clearly be seen through the car windows once Short abandoned his vehicle in the

Novartis parking lot. See Hattan, 460 U.S. at 261. The defendants elected to enter the Novartis parking lot and park the gray car. Later, when law enforcement officials were attempting to detain Short, Short attempted to flee the parking lot. Short therefore elected to abandon his vehicle in the Novartis parking lot – a location where law enforcement officers were rightly present – thus meeting the final prong of the "plain view" exception. See United States v. Bynum, 508 F.3d at 1137.

The search of the vehicle was valid for the alternative reason that probable cause was present. Officers may search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of a crime. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000)(citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Given the totality of the circumstances in this case, a reasonable law enforcement officer could conclude there was a fair probability that evidence of a crime would be found in the vehicle. See United States v. Brown, 345 F.3d 547, 580 (8th Cir. 2003). As detailed above, the law enforcement officers in this case were faced with individuals who met the general description of the suspected bank robbers traveling on one of the know exit routes from the city shortly after the robbery, one of the suspects was found with a wad of cash, and Short took evasive action once he saw that Cotton and Rush were being detained. The information gained by the officers quickly escalated the factual basis of the initial encounter from a consensual encounter between law enforcement officers and citizens to one justifying a search based on probable cause. See United States v. Ameling, 328 F.3d 443, 448-449 (8th Cir. 2003)(noting that the conduct of the suspects and circumstances present after a

valid stop presented to a law enforcement officer probable cause for a warrantless search of the vehicle).

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Warren K. Urbom, United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motions to suppress filed by Traves Rush, (filing no. 37), and by Marcus Short, (filing no. 43), be denied in their entirety.

The parties are notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

DATED this 4th day of March, 2010.

BY THE COURT:

s/ *Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

11