IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CR3117 |
| | ) | |
| v. | ) | |
| | ) | |
| TRAVES RUSH and MARCUS SHORT, | ) | MEMORANDUM AND ORDER ON THE |
| | ) | DEFENDANT'S OBJECTIONS TO THE |
| Defendants. | ) | MAGISTRATE JUDGE'S FINDINGS AND |
| | ) | RECOMMENDATION |

Defendants Traves Rush and Marcus Short moved to suppress evidence that was seized from a vehicle on October 6, 2008.  (See filings 37, 43.)  United States Magistrate Judge Cheryl R. Zwart presided over a hearing of these motions on February 16, 2010, (see filings 52-56), and in accordance with 28 U.S.C. § 636(b)(1)(B)-(C) and Federal Rule of Criminal Procedure 59(b)(1), the magistrate judge has recommended that I deny the defendants' motions.  (See filing 58.)  Now before me is Mr. Rush's objection to the magistrate judge's Findings and Recommendation.  (See filing 62.)  In the course of my de novo review of those portions of the magistrate judge's Findings and Recommendation that Mr. Rush challenges, see United States v. Lothridge, 324 F.3d 599, 600 (8th Cir. 2003); 28 U.S.C. 636(b)(1); Fed. R. Crim. P. 59(b)(3), I have studied the magistrate judge's Findings and Recommendation, (filing 58), the motions and briefs submitted by the parties, (filings 37-38, 43-45, 62-64), the transcript of the hearing before the magistrate judge, (filing 61), and the exhibits received during the hearing, (see filing 56). After carefully reviewing these materials, I find that the magistrate judge's recommendation should be adopted.  Mr. Rush's objections will be overruled, and his motion to suppress will be denied.[1]

---

[1] Mr. Short did not object to the magistrate judge's Findings and Recommendation, and his motion to suppress will be denied in accordance with the magistrate judge's recommendation.

1

## I.   BACKGROUND

The magistrate judge's Findings and Recommendation sets forth the relevant facts clearly and accurately. (See filing 58 at 1-4.) The facts will be summarized again here in the interest of convenience.

On October 6, 2008, at approximately 12:15 p.m., Lancaster County Sheriff's Deputy Kirk Price heard a radio report concerning a robbery of the TierOne Bank near the corner of 56th Street and Highway 2 in Lincoln, Nebraska. Deputy Price recalls the report stating that three black males were involved in the robbery and were seen leaving the bank in a blue Chrysler LeBaron. (Tr., filing 61, at 4-5.) He also recalls the report stating that one of the men was wearing a black hooded sweatshirt and that the other men were wearing red sweatshirts. (Id. at 81.) A later report stated that the blue LeBaron had been found abandoned, and there was a possibility that the men were now using a red vehicle. (Id. at 5-6.) Deputy Price drove to a gas station at the southeast corner of 84th Street and Highway 6, hoping to spot the robbery suspects traveling out of Lincoln toward Interstate 80. (Id. at 6-7, 37.)

Lincoln Police Officer Mark Johnson also heard radio reports about the TierOne Bank robbery. He recalled a report stating that the suspects were three black males, but he also recalled another report indicating that "there was a white male in the mix." (Tr., filing 61, at 121.) Like Deputy Price, Officer Johnson traveled to the area of the 84th Street and Highway 6 intersection to watch for the robbery suspects. He stopped his police cruiser on Highway 6 three or four blocks east of the 84th Street intersection, and he was able to see Deputy Price's cruiser at the gas station from his location.

Soon after he arrived at the gas station, Deputy Price observed a dark gray vehicle containing three black males turn east on Highway 6 toward the interstate. The deputy pulled onto Highway 6 to follow the vehicle "to try to make some further observations." (Tr., filing 61, at 8.) As he followed the vehicle, Deputy Price observed damage to the left rear of the vehicle and numbers written on the upper left corner of the rear window. He testified that "[i]t went through [his] mind that this could have been a salvage vehicle, that if somebody needed a get-away vehicle or whatever, they could have found it on the lot and it would be so easily disposable." (Id. at 9.) The deputy did not activate his emergency lights or siren or otherwise

direct the vehicle to stop.

Officer Johnson observed the same gray vehicle–and its occupants–from his vantage point on Highway 6. He testified that he decided to stop the car, but Deputy Price was ahead of him. (Tr., filing 61, at 102.) "As soon as [he] could get out of the traffic, [he] tried to catch up to both the deputy and the car." (Id.) He did not activate the lights or sirens on his police cruiser.

Meanwhile, Deputy Price followed the gray vehicle for less than two miles before it turned off of Highway 6 and into the main entrance to the Novartis complex. The deputy continued to follow the vehicle as it looped through the Novartis parking lot. The gray vehicle stopped by the main entrance to the Novartis building, and an individual later identified as Curtis Cotton exited the vehicle and entered the building. The gray vehicle then turned down a parking row and pulled into a parking stall.

Deputy Price followed the gray vehicle into the same parking row and stopped his cruiser in the row. His vehicle was positioned such in a way that it did not prevent the gray vehicle from backing out of is parking stall and driving away. After he observed a second man, later identified as Traves Rush, exit the gray vehicle, Deputy Price exited his cruiser and approached Mr. Rush on foot. Mr. Rush was dressed in a white tee shirt and dark pants or jeans. (Tr., filing 61, at 19.) Deputy Price asked Mr. Rush "where they were going, where they were coming from, [and] what they were doing there." (Id. at 18.) He used a tone of voice that he described as "normal conversation." (Id. at 50.) Mr. Rush replied that "they were from Omaha, going to Omaha," and that they stopped at Novartis so that Mr. Cotton could see his mother, who worked there. (Id. at 20.) At about this time, Officer Johnson arrived at the scene, parked his police cruiser several car lengths behind Deputy Price's cruiser, and exited his cruiser. (Id. at 105-06.)

Deputy Price then observed that Mr. Cotton had exited the Novartis building and was walking toward the gray vehicle. Mr. Cotton was dressed in a gold hoody sweatshirt, long, baggy, dark jeans, and high-top athletic shoes that were untied or loosely tied. Deputy Price approached Mr. Cotton and noticed a thick roll of currency stuck in the top of one of Mr. Cotton's shoes. He could see "zeros" on the bill that formed the outside of the roll. (Tr., filing 61, at 22, 58.) Deputy Price then grabbed the roll of currency and handcuffed Mr. Cotton. Upon observing Deputy Price's actions, Officer Johnson "took hold" of Mr. Rush and placed him in the

back seat of his police cruiser. (Id. at 107.)

The third man, who was later identified as Marcus Short, remained in the gray vehicle. While Deputy Price and Officer Johnson took Mr. Cotton and Mr. Rush into custody, Mr. Short quickly backed the gray vehicle out of its parking stall and began to drive away rapidly. Officer Johnson then entered his police cruiser and pursued the gray vehicle. The gray vehicle circled through the parking lot and ultimately turned back down the parking row where Deputy Price's cruiser remained parked. The gray vehicle veered to the right of Deputy Price's cruiser and came to a stop against a parked car. Mr. Short exited the gray vehicle without turning off the engine and ran through the parking lot toward Highway 6. He was wearing red shorts and a black pullover tee shirt. (Tr., filing 61, at 30.) Officer Johnson pursued Mr. Short on foot and yelled, "Stop, you're under arrest." (Id. at 114.) After a chase, Mr. Short was apprehended in a farm field north of Highway 6.

While Officer Johnson pursued Mr. Short on foot, Deputy Price entered the gray vehicle and backed it up a short distance to allow a woman who came out of the Novartis building to leave in her car–which happened to be the same car that the gray vehicle came to rest against before Mr. Short began running. (Tr., filing 61, at 31-32.) Deputy Price did not search the vehicle for evidence related to the TierOne Bank robbery.

After hearing a radio report that Officer Johnson was involved in a foot pursuit, Lincoln Police Officer Larry Bratt drove to the Novartis parking lot. Upon his arrival, he was assigned to "process" the gray vehicle. (Tr., filing 61, at 140.) While standing outside of the vehicle, he observed a "wad of cash folded up" and a small part of a blue bank bag on the front passenger side floorboard, a plastic bank bag on the front passenger seat, and a "colorless opaque plastic bag that appeared to have large amounts of U.S. currency in it" on the rear passenger side floorboard. (Id. at 141.) He took photographs from his vantage point outside the car, (see Gov'ts Exs. 4-7), though one of the photos was taken with the rear passenger side door open, (see Tr., filing 61, at 149-50 (explaining that Exhibit 7 is a photograph that was taken with the door open because the camera could not focus through the window's glare)). He also took photographs after moving some of the items in the vehicle. (Compare Defs.' Ex. 108 with Defs.' Ex. 109; compare Defs.' Ex. 105 with Defs.' Exs. 106 & 107; compare Defs.' Ex. 106 with Defs.' Ex.

104; see also Tr., filing 61, at 151-53, 153-156, 156-57, 159, 162-63.)

As noted above, Mr. Rush and Mr. Short moved to suppress all evidence seized from the gray vehicle on October 6, 2008. (See filings 37, 43.) In support of their motions, the defendants argued that Mr. Rush's initial encounter with Deputy Price was not consensual, but rather an unreasonable, unconstitutional seizure; that Mr. Short was subjected to a baseless investigatory stop in the Novartis parking lot; that the Deputy unlawfully blocked Mr. Short's car in the parking stall; that the stopping of the gray car was unlawful; that Mr. Short's arrest was unlawful; and that the warrantless search of the gray vehicle violated the Fourth Amendment. (See, e.g., filing 38 at 7-8; filing 43 at 4-5; filing 44 at 3-4.) The magistrate judge considered the defendants' arguments and concluded that 1) the initial contact between Deputy Price and the defendants was consensual, 2) the seizure of the evidence from the gray vehicle was proper under the plain view exception to the warrant requirement, and 3) alternately, the search of the gray vehicle was supported by probable cause. (See filing 58 at 4-11.) On March 19, 2010, Mr. Rush filed an objection to the magistrate judge's findings and conclusions. (See filing 62.) My analysis of his objections follows.

## II.   ANALYSIS

Mr Rush raises three specific objections to the magistrate judge's findings and recommendation. (See generally filing 62.) First, he submits that Deputy Price lacked a reasonable suspicion to justify the detention of Mr. Rush during their initial encounter. (See id. at 1; see also filing 63 at 2.) He also argues that the officers' detention of Mr. Rush after the roll of cash was discovered in Mr. Cotton's shoe was not supported by a reasonable suspicion of criminal activity. (See filing 63 at 2.) Second, he submits that law enforcement lacked a reasonable, articulable suspicion to make an investigatory stop of the gray vehicle. (See filing 62 at 1; see also filing 63 at 2.) Third, he submits that the plain view exception does not justify the warrantless search of the vehicle and that the officers lacked probable cause to search the vehicle. (See filing 62 at 1; see also filing 63 at 2-3.) I shall consider each of these objections in turn.

### A.  The Initial Encounter Between Mr. Rush and Deputy Price and the Subsequent Seizure of Mr. Rush

The magistrate judge found that the initial encounter between Mr. Rush and Deputy Price did not amount to a seizure within the meaning of the Fourth Amendment. (See filing 58 at 5-6.) Mr. Rush objects to this finding and argues that he was seized without reasonable suspicion or probable cause. (See filing 63 at 2.) I find that the magistrate judge correctly concluded that this encounter was consensual and not a seizure.

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable searches merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002) (citations omitted). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage–provided they do not induce cooperation by coercive means." Id. at 201 (citing Florida v. Bostick, 501 U.S. 429, 434-35 (1991)). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." Id. See also Bostick, 501 U.S. at 437 ("[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"). "When conducting this analysis, '[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" United States v. Barry, 394 F.3d 1070, 1075 (8th Cir. 2005) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." Id. (quoting Mendenhall, 446 U.S. at 555).

Mr. Rush argues that when he "exited the car and was immediately approached by Deputy Price demanding to know where he was going, what he was doing and where he had come from," he "certainly was not free to continue walking into Novartis nor was he free to ignore Deputy

Price's questioning." (Filing 63 at 2.) I disagree. Deputy Price did not signal the gray vehicle in which Mr. Rush was riding to stop; the driver of that vehicle drove into the Novartis complex, and eventually parked there, without any order or direction from a law enforcement officer. Nor did Deputy Price order Mr. Rush, or any other occupant of the gray vehicle, to exit the vehicle and speak with him. When Mr. Rush exited the gray vehicle on his own accord, Deputy Price exited his cruiser, approached Mr. Rush, and asked him a few questions in a normal tone of voice and without any show of force or physical touching. Mr. Rush answered the questions, and Deputy Price turned away to approach Mr. Cotton. In short, no objective circumstances that might indicate that a seizure occurred at this time have been shown to be present. See, e.g., United States v. Barry, 394 F.3d 1070, 1075 (8th Cir. 2005). I therefore find that the encounter between Mr. Rush and Deputy Price did not amount to a seizure within the meaning of the Fourth Amendment; rather, it was consensual.

Mr. Rush <u>was</u> seized by Officer Johnson moments after the initial encounter between Mr. Rush and Deputy Price. The seizure occurred when Officer Johnson placed Mr. Rush into the back of his police cruiser after he observed Deputy Price take hold of Mr. Cotton. The magistrate judge found that this seizure was supported by a reasonable suspicion that the men were involved in criminal activity. (See filing 58 at 7-8.) Mr. Rush argues that "the money that was seized from Curtis Cotton's shoe does not create reasonable suspicion or probable cause to detain Rush." (Filing 63 at 2.) I find, however, that Officer Johnson's placing of Mr. Rush in the back of the police cruiser was supported by a reasonable, articulable suspicion of criminal activity.

"A Terry investigatory stop allows an officer briefly to detain a citizen if the officer has a reasonable suspicion that 'criminal activity may be afoot.'" United States v. Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). See also United States v. Hensley, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion."). This detention may last while the officer makes "'reasonable inquiries' aimed at confirming or dispelling his suspicions." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993)

(citing Terry, 392 U.S. at 30). "In making reasonable-suspicion determinations, reviewing courts 'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.'" United States v. Martinez-Cortes, 566 F.3d 767, 769 (8th Cir. 2009) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). "In forming a basis for suspicion, officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" Ortiz-Monroy, 335 F.3d at 529 (quoting Arvizu, 534 U.S. at 273)  Furthermore, "an officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation to provide justification for a stop." Id. (citing United States v. Robinson, 119 F.3d 663, 666-67 (8th Cir. 1997)).

    As the magistrate judge noted, the totality of the circumstances show that the officers were justified in detaining Rush in the back of Officer Johnson's police cruiser: Deputy Price and Officer Johnson were investigating a bank robbery, and "Rush, Short, and Cotton met the general description [(i.e., the race and number)] of the suspects who robbed the Bank.  They were spotted shortly after the robbery was reported at a location which was a potential escape route leading out of the city.  [And] Deputy Price spotted a roll of U.S. currency laying [sic] loosely atop Cotton's untied high-top shoes." (Filing 58 at 7-8 (citation omitted).)  The roll of currency was thick, and Deputy Price could see that the outermost bill bore at least two zeros.  Under these circumstances, Deputy Price and Officer Johnson had a reasonable, particularized, and objective basis for suspecting that the three men were involved in the bank robbery, and they were justified in detaining the men until their suspicions could be dispelled.[2]

    I am mindful that Officer Johnson recalled a radio report indicating that a white male might somehow be connected with the robbery.  I am also mindful that the clothing worn by Mr.

---

[2] As it happened, Mr. Short attempted to flee the scene while Deputy Price and Officer Johnson detained Mr. Cotton and Mr. Rush, respectively.  Though Mr. Short's flight may well have prolonged the detention of Mr. Rush in the back of the cruiser–indeed, he remained in the back of Officer Johnson's cruiser during the pursuit–Mr. Short's flight also provided the officers with an additional particularized and objective basis for suspecting that the men were involved in the robbery.

Rush, Mr. Short, and Mr. Cotton did not match the radio report's description of the robbery suspects' clothing and that their vehicle did not match the report that the suspected robbers might be traveling in a red vehicle. These circumstances do not weigh in favor of a finding that the officers had a sufficient basis for detaining the men.[3] The totality of the circumstances show, however, that the placing of Mr. Rush in the back of the police cruiser was justified until a reasonable investigation of his involvement in the robbery could be completed. In short, it was reasonable for the officers to seize all of the men to investigate their possible involvement in the bank robbery because the group of men fit the basic description of the group of suspects who robbed the bank, the men were traveling along a route that led from the bank to the interstate shortly after the robbery, and, most importantly, one of the men was spotted with a thick roll of cash lying in the top of his shoe. No seizure occurred before Deputy Price observed the roll of currency, and after the currency was spotted it was reasonable for the officers to detain the men to investigate their involvement in the robbery.

### B. The Stopping of the Gray Vehicle

Mr. Rush argues that the magistrate judge erred by finding "[t]hat law enforcement had a reasonable, articulable suspicion to conduct an investigatory stop of the vehicle." (Filing 62 at 1.) After studying Mr. Rush's brief, I take it that he is referring here to the initial stopping of the vehicle in the Novartis parking lot by Deputy Price–not the subsequent stopping of the vehicle by Officer Johnson after Mr. Short attempted to flee in it. (See filing 63 at 2.) As I read the Findings and Recommendation, however, the magistrate judge did not reach a conclusion that Deputy Price had a reasonable suspicion that justified an investigatory stop of the gray vehicle. It seems to me, rather, that the magistrate judge found that the stopping of the vehicle did not implicate the Fourth Amendment. (See filing 58 at 4-6.) I agree with this conclusion. As I noted in Part II.A. above, the driver of the gray vehicle drove from Highway 6 into the Novartis

---

[3] I agree with the magistrate judge, however, that the discrepancy between the radio report's description of the vehicle that the suspects might be using and the characteristics of the vehicle being used by Mr. Short, Mr. Rush, and Mr. Cotton is not very significant in light of the report that the suspects had abandoned their original getaway vehicle.

complex, dropped off Mr. Cotton by the main entrance, and parked the car in a parking row all on his own volition. Deputy Price followed the gray vehicle at this time, and although he admits that he was suspicious of the men's involvement in the robbery, he did not activate his cruiser's lights or siren or otherwise direct the vehicle to stop. No traffic stop, investigatory stop, or any other sort of seizure within the meaning of the Fourth Amendment occurred before Mr. Cotton was observed with a thick roll of currency resting in the top of his untied shoe. Because the Fourth Amendment is not implicated, I must reject Mr. Rush's argument that the vehicle was stopped unlawfully by Deputy Price.

### C. The Search of the Vehicle

Finally, Mr. Rush argues that "[t]he conclusion by Judge Zwart that the warrantless search of the automobile was supported by probable cause and/or fell under the plain view exception was . . . erroneous." (Filing 63 at 2.) More specifically, he claims that "[i]n order for the plain view exception to apply, the initial stop of the vehicle must be legal," and that the magistrate judge "erred when so finding." (Id. at 2-3.) As I have explained above, however, the initial stop of the gray vehicle did not violate the Fourth Amendment. I adopt in full the magistrate judge's analysis of the applicability of the plain view exception to the Fourth Amendment's warrant requirement. (See filing 58 at 6-10.)

In summary, I find that the parking of the gray vehicle at the Novartis complex did not implicate the Fourth Amendment; Mr. Rush's initial contact with Deputy Price was consensual, and therefore it too did not implicate the Fourth Amendment; the seizure of Mr. Rush by Officer Johnson was supported by a reasonable, particularized suspicion that Mr. Rush was involved in a bank robbery; and the search of the gray vehicle did not violate the Fourth Amendment. The evidence obtained from the gray vehicle will not be suppressed in this case.

**IT IS ORDERED** that:

1. Mr. Rush's objections to the magistrate judge's report and recommendation, filing 62, are overruled;

2. the magistrate judge's recommendation, filing 58, is adopted; and

3.        Mr. Rush's and Mr. Short's motions to suppress, filings 37 and 43, are denied.

Dated April 9, 2010.

                                      BY THE COURT

                                      s/ Warren K. Urbom
                                      United States Senior District Judge